STATE OF MAINE  SUPERIOR COURT
CUMBERLAND, ss. CIVIL ACTION
DOCKET NO. CV-07-15

'1 MAY 8 P 2: 05

XWAVE NEW ENGLAND CORP.,

      Plaintiff

v.

                                            ORDER ON MOTION
                                            FOR TEMPORARY
                                            RESTRAINING ORDER

WILLIAM ZIEGENFUS,

DONALD L. GARBRECHT
LAW LIBRARY

      Defendant

AUG 2 0 2007

Before the Court is Plaintiff XWave New England Corp.'s ("XWave") motion for a temporary restraining order pursuant to M.R. Civ. P. 65 barring Defendant William Ziegenfus ("Defendant") from providing his services to former XWave clients as well as barring Defendant from using confidential information obtained while employed by XWave in support of his independent business venture.

## BACKGROUND

For purposes of ruling on the present motion, the facts apparent from the submissions of the parties are as follows. XWave is an information technology company that employed Defendant as a full-time salaried network engineer from August 18, 1997 through May 31, 2006.[1] Defendant's duties while employed by XWave included providing network consulting services at clients' places of business. Defendant was assigned to specific customer accounts.

---

[1] Defendant was originally hired by an entity known as TechKnowledge, Inc. XWave acquired that company in 2001.

1

When he was hired, Defendant signed a document titled "Employee Non-Disclosure and Non-Competition Agreement" ("Agreement"). The Agreement reads in part as follows:

> 2. Protection of Confidential Information. At all times Employee agrees to keep confidential and not to utilize any Confidential Information for any purpose, except in the course of Employee's employment with TechKnowledge Inc. Employee agrees not to publish, disclose or otherwise disseminate such information without prior written approval of the President of TechKnowledge Inc. . . .

> 4. Obligations of Employees After Employment. Employee agrees that he or she will protect the value of the Confidential Information . . . of TechKnowledge Inc. and its clients after employment, will prevent the misappropriation or disclosure thereof and will not use any such Confidential Information to his or her benefit (or the benefit of any third party) or to the detriment of TechKnowledge Inc. or its clients.

> 5. Full-time . . . employee will not solicit or accept employment from any customers or prospective customers of TechKnowledge during employment and for 1 year after termination of employment without a written consent from the President of TechKnowledge or an agreement by the employee (or customer) to pay TechKnowledge compensation for the hiring and training of a replacement employee. The amount of compensation to be paid TechKnowledge will not exceed 12 times the employee[']s monthly salary.

On May 31, 2006 Defendant voluntarily terminated his employment with XWave to start his own business, eZe Tech, Inc. ("eZe Tech"). Defendant is the only employee of eZe Tech and runs that company out of his home. eZe Tech provides similar services to those of XWave. Following Defendant's departure, a number of XWave clients switched from XWave to eZe Tech for their network servicing needs. In fact, by XWave's unrebutted estimate, eight of eZe Tech's nine clients are former XWave clients.

XWave brought suit against Defendant by a complaint filed January 11, 2007 requesting preliminary and permanent injunctive relief (Count I) for

2

Defendant's actions allegedly constituting a breach of contract (Count II), misappropriation of trade secrets under the Uniform Trade Secrets Act, 10 M.R.S.A. § 1542, (Count III), and tortious interference with advantageous relations (Count IV).

## STANDARD OF REVIEW

In order to succeed on a motion for a temporary restraining order, the moving party has the burden of demonstrating the following: "(1) that plaintiff will suffer irreparable injury if the injunction is not granted, (2) that such injury outweighs any harm which granting the injunctive relief would inflict on the defendant, (3) that plaintiff has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility), (4) that the public interest will not be adversely affected by granting the injunction." *Ingraham v. University of Maine*, 441 A.2d 691, 693 (Me. 1982). These four criteria, however, "are not to be applied woodenly or in isolation from each other; rather, the court of equity should weigh all of these factors together in determining whether injunctive relief is proper." *Dep't of Envtl. Prot. v. Emerson*, 563 A.2d 762, 768 (Me. 1989). For example, if the evidence of success on the merits is strong, the showing of irreparable harm may be subject to less stringent requirements. *Id.*

## DISCUSSION

### I. Expiration of Noncompete Period

A threshold issue is whether, assuming *arguendo* that XWave can satisfy the *Ingraham* factors, the Court may enjoin Defendant from competing with XWave beyond a period one year from when Defendant terminated his

3

employment as provided in the Agreement.[2] The Law Court has not directly addressed this issue. In *Saga Communs. Of New England, Inc. v. Voornas*, however, it observed in dicta that

> [w]e need not now decide whether [the plaintiff] could impress upon the court the necessity of granting it injunctive relief beyond the noncompete period except to note that historically, the Maine courts have taken a conservative attitude towards injunctions, holding the injunction to be an extraordinary remedy only to be granted with utmost caution when justice urgently demands it and the remedies at law fail to meet the requirements of the case.

2000 ME 156, ¶ 19, 756 A.2d 954, 962 (internal quotations omitted).

This caution expressed by the Law Court in *Voornas* carries little weight in the present situation as the facts underlying that case are dissimilar in key respects from those here.

*Voornas* involved a defendant employed as an on-air radio talent whose noncompete agreement with her employer stated that she "was precluded for a period of six months from performing services as an on-air announcer for any [competing] radio station [with]in a 75-mile radius." *Id.* ¶ 2, 756 A.2d at 956. Despite this agreement, shortly after leaving her employer and well before the expiration of her noncompete agreement, the defendant accepted employment with a competing radio station. *Id.* ¶ 3, 756 A.2d at 956. The defendant, however, *"did not immediately return to the air*, but instead undertook general promotional activities for [her new employer]." *Id.* ¶ 3, 756 A.2d at 957 (emphasis added). As a result, during the pendancy of the litigation, the defendant in *Voornas* did not violate her noncompete agreement.

---

[2] There was no such time limitation on Defendant's non-disclosure of confidential information.

4

From the context of the above facts, it is clear that the Law Court's expressed reluctance to grant an injunction enforcing the noncompete agreement in that case beyond its original time frame was in reaction to the fact that the defendant there had already honored the terms of the agreement while litigation proceeded.

In contrast, XWave alleges that Defendant failed to honor his noncompete agreement from the beginning. As a result, enjoining Defendant from competing with XWave would be equitable. Nothing in *Voornas* suggests otherwise.

## II. Likelihood of Success of the Merits

Pursuant to the Agreement, Defendant contracted, upon termination of his employment, not to accept work from XWave clients for one year. Defendant's job involves generic skills, at least from a client's perspective. As such, a primary factor determining whether a client will repeatedly use the same network services company is the relationship it builds with that company. As the one who most closely interacted with clients on behalf of XWave, Defendant was in a position to build that relationship. It is likely that the potential for development of such relationships was a motivating factor behind XWave including the noncompete clause in the Agreement. Without this clause, employees could take advantage of relationships built with XWave clients to leave the company and take those clients with them. That is what evidently happened here as virtually all of eZe Tech's clients are former XWave clients. Given that eZe Tech accepted employment from these clients within one year of the termination of Defendant's employment, it is highly likely that XWave will

5

succeed on its claim alleging violation of the noncompete clause of the Agreement.[3]

In addition, there is evidence that, at least in a some cases, Defendant may have used his knowledge of proposed price point proposals for XWave clients to offer lower priced proposals for the same services to those clients through eZe Tech. Such actions, if proved at trial, would constitute a breach of the confidential information clause in the Agreement and potentially qualify as a violation of the Maine Trade Secrets Act. *See* 10 M.R.S.A. §§ 1541-1548; *Spottiswoode v. Levine*, 1999 ME 79, ¶ 27, 730 A.2d 166, 174-75 (holding that "for information to qualify as a trade secret, [it] must: (1) derive independent economic value, actual or potential, from not being generally known [or] readily ascertainable; and (2) be the subject of efforts that are reasonable under the circumstances - to maintain its secrecy" (internal quotations omitted)).

## III. Irreparable Injury

An irreparable injury is one for which there exists no adequate remedy at law. *Bar Harbor Banking & Trust Co. v. Alexander*, 411 A.2d 74, 79 (Me. 1980). In this case, the loss of business relationships through Defendant's apparent violation of the Agreement satisfies the irreparable injury requirement. In essence, it will be impossible to do more than speculate as the value of the

---

[3] The Court is not persuaded that the term "accept employment from any customers or potential customers" in the Agreement referred only to serving as in house technicians for XWave customers. The plain language of the Agreement evidences an intent to prohibit not simply full time employment of Defendant by XWave clients but also the kind of independent contractor arrangement engaged in here.

6

business lost to XWave through Defendant's successful efforts to lure that business to eZe Tech.[4]

## IV. Balancing of Harms and Adverse Effect on Public Interest

The final two *Ingraham* factors require only a brief mention. To the extent that Defendant is harmed by a prohibition on accepting employment from former XWave clients, such a harm does not outweigh the harm suffered by XWave through the loss of these clients. Further, the fact that a prohibition on accepting employment from former XWave clients may result in a bar against servicing almost all of Defendant's clients only further reinforces the egregious nature of his violation of the noncompete clause of the Agreement.

Finally, enforcement of the Agreement would not adversely affect the public interest. The clauses are reasonable attempts to guard against the behavior by former employees that forms the basis of the present suit. A company may permissibly take steps to ensure that it does not serve as a temporary pit stop in which employees form relationships with its clients and then leverage those relationships, immediately upon termination of their employment, to poach clients for a competing business venture.

---

[4] The Court comes to this conclusion notwithstanding two cases in which courts held that the possible difficulty involved in calculating damages stemming from a prospective future economic injury as a result of a defendant's violation of a noncompete agreement was too speculative to support preliminary injunctive relief. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop*, 839 F. Supp. 68, 74-5 (D. Me. 1993); *Coast to Coast Engineering Svcs. v. Stein*, 2006 Me. Super. LEXIS 264, *6-*7 (Dec. 12, 2006). Those cases are distinguishable in that speculation on whether Defendant may violate the noncompete clause of the Agreement is unnecessary as the facts before the Court show that Defendant has already violated the Agreement by soliciting and accepting employment from XWave clients. As a result, "[t]here is no need to speculate that the goodwill [Defendant] nurtured with [XWave]'s customers while [he was] employed by [XWave] will lead to ferreting away [XWave's] customers -- it has already happened." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 192 (D. Me. 2005).

Therefore the entry is:

XWave's motion for a temporary restraining order is GRANTED. Defendant shall not accept or continue employment with any persons or entities that were clients of XWave during the term of his employment at XWave. Defendant shall not use confidential information obtained during his employment at XWave to further eZe Tech's or his own individual business interests. Defendant is also prohibited from accepting employment from the clients of Joel McLean and Michael Pratt that their company, Downeast Networks, Inc., is enjoined from servicing pursuant to the temporary restraining order issued on this date in *XWave New England v. Joel McLean, et al.* (Docket No. CV-07-16). This order shall remain in effect until the decision on issuance of a permanent injunction.

The clerk shall incorporate this Order into the docket by reference pursuant to M.R. Civ. P. 79(a).

Dated at Portland, Maine this _18th_ day of _May_, 2007.

Robert E. Crowley
Justice, Superior Court

8

ROBERT LASKOFF ESQ  -
WILLIAM COTE ESQ
LASKOFF & ASSOCIATES
PO BOX 7206
LEWISTON ME 04243-7206

ROBERT BROOKS ESQ  -
VERRILL & DANA
PO BOX 586
PORTLAND ME 04112-0586

TIMOTHY O'BRIEN ESQ  -
VERRILL & DANA
PO BOX 147
KENNEBUNK ME 04043